**UNITED STATES OF AMERICA,**

v.

**Angelo ARIAS, Defendant.**

**No. 04 CR. 411 GEL.**

United States District Court,
S.D. New York.

Sept. 20, 2005.

Paul S. Brenner, New York, NY, for Defendant Angelo Arias.

Julian Schreibman, Assistant United States Attorney (David N. Kelley, United States Attorney for the Southern District of New York, of counsel), New York, NY, for the United States of America.

## OPINION AND ORDER

LYNCH, District Judge.

On April 19, 2005, Angelo Arias purported to enter a plea of guilty to an indictment charging him with conspiring to distribute 50 grams and more of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841. Arias allocuted that he "knowingly conspire[d] with other persons to distribute a controlled substance in violation of the narcotic laws of the United States." (4/19/05 Tr. 48.) On further questioning, Arias acknowledged that he worked with other people to "sell some kind of ... illegal drug," and that he knew at the time that he was acting in violation of the law. (*Id.*) The Government did not object to the validity of Arias's plea, specifically advising the Court that there was "[no]thing else ... necessary for a factual predicate for the plea" (*id.*), and the Court accepted the plea. The Government now moves the Court to withdraw its acceptance of the defendant's plea. (Letter of AUSA Julian D. Schreibman to the Court, dated April 26, 2005 ("Schreibman Letter").) Arias opposes the motion, arguing that his plea was validly entered. (Letter of Paul S. Brenner, Esq., to the Court, dated May 10, 2005.) This unusual spectacle—a defendant insisting that he has been validly convicted of a crime, while

the Government equally fervently insists that he should still be presumed innocent—is the culmination of a confusing series of plea bargaining maneuvers. For the reasons set out below, the Government's motion is granted, the Court's acceptance of Arias's guilty plea is withdrawn, and the attempted plea is rejected as insufficient.

## PROCEDURAL HISTORY

On April 28, 2004, Arias was indicted and charged with conspiring to distribute more than 50 grams of methamphetamine. Because of the quantity and nature of the controlled substance allegedly involved, 21 U.S.C. § 841(b)(1)(A)(viii) provides for a mandatory minimum sentence of ten years' imprisonment, and a potential maximum sentence of life imprisonment. If the quantity of methamphetamine involved in the alleged transaction had been smaller, the penalties would be lower: for an amount between 5 and 50 grams, the statutory sentencing range provides for five to forty years of incarceration, 21 U.S.C. § 841(b)(1)(B)(viii); for an amount less than five grams, the statute provides for no mandatory minimum, and a twenty year maximum sentence in prison, 21 U.S.C. § 841(b)(1)(C). If the drug distributed was something other than methamphetamine, the statutory scheme provides for a penalty based on other quantitative calculations; indeed, if the drug was marijuana, and the quantity was small enough, the statute provides for a maximum penalty of five years in prison, 21 U.S.C. § 841(b)(1)(D). These differing penalties provide the backdrop for the disputed legal issues in this case.

## I. *The Proposed Bench Trial*

Within a relatively short time after arraignment, on August 26, 2004, Arias indicated to the Court that he expected to enter a plea of guilty, and protracted negotiations with the Government ensued. Apparently, Arias was willing to admit that he was guilty of conspiring to distribute methamphetamine,[1] but disputed the quantity attributed to him in the indictment. The parties disputed not only the facts, but how the facts were to be determined— whereas the Government insisted that it need only prove the disputed quantity by a preponderance of the evidence to the Court at sentencing, Arias contended that the Government must prove the quantity beyond a reasonable doubt to the jury at trial. As is often the case, the parties' critical practical concern was not the effect of drug quantity on the statutory maximum (since neither side apparently expected that a sentence beyond ten years would be imposed), but the drug quantity's effect on the mandatory minimum sentence, which would likely control the actual sentence imposed by the Court.

Although a date for entry of a plea was set, and later adjourned, the parties ultimately proved unable to work out a disposition satisfactory to both sides, and a trial date was set. Eventually, Arias and the Government suggested to the Court the possibility of a bench trial, and sought a pre-trial ruling concerning the elements of the offense that the Government must prove at trial, and the Government's corresponding burden of proof. (4/6/05 Tr. 8.) Neither party disputed that the Government bore the burden of proving beyond a reasonable doubt that Arias conspired to distribute a controlled substance, and that if the Government could not sustain that

---

1. If there was any dispute at that time about the nature of the drug involved in the conspir- acy, the Court was not made aware of it.

burden of proof, Arias must be acquitted altogether of the charge against him.

In addition to challenging the Government's proof of guilt, however, Arias proposed to argue that even if the Government could prove that he conspired to distribute methamphetamine, it could not prove beyond a reasonable doubt that he conspired to distribute in excess of 50 grams of the substance. The parties appeared to contemplate the possibility of a finding that the Government had proved beyond a reasonable doubt that Arias conspired to distribute the drug, but had proved that the conspiracy involved the required 50-gram amount only by a preponderance of the evidence—not beyond a reasonable doubt.[2] The parties disagreed as to the legal effect of such a finding.

The Government argued that if it proved beyond a reasonable doubt that Arias conspired to distribute the drug, but proved that the conspiracy involved the 50-gram amount only by a preponderance of the evidence, the Court should return a verdict of guilty, and sentence Arias to a term of imprisonment between 10 and 20 years. The Government contended that the offense charged is the unitary offense of "conspiring," in violation of § 846, to "distribute ... a controlled substance," in violation of § 841(a), and that the Government's burden of proving guilt is satisfied if it establishes beyond a reasonable doubt that Arias committed that offense. The Government's argument rested on its view that Congress intended the nature and quantity of the controlled substance involved to be mere "sentencing factors," that need only be proved by a preponderance of the evidence. According to the Government's theory, Congress intended that after a finding at trial (beyond a reasonable doubt, by a jury unless the defendant waived a jury trial) that a defendant was guilty of conspiracy to distribute drugs, the Court would determine at sentencing (by a preponderance of the evidence, and without a right to jury determination) whether the amount and nature of the substance involved was sufficient to trigger the enhanced sentencing ranges under §§ 841(b)(1)(A) and (B). On the Government's view, Congress intended that where the Government could prove beyond a reasonable doubt only that a defendant conspired to engage in one sale of three grams of methamphetamine, but could prove an additional sale of 47 grams by a preponderance of the evidence, the defendant would be subject to a sentence as long as life imprisonment, and in any event no less than ten years.

The Government conceded that, under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the statute, as Congress purportedly intended it to be read, is partially unconstitutional: absent a jury finding beyond a reasonable doubt of 50 grams of methamphetamine, it would be unconstitutional for the Court to sentence a defendant to any prison term

---

**2.** As the parties have not yet had an opportunity to present the Court with the proof, a hypothetical set of facts will serve to illustrate the practical problem. Suppose, for example, that two conspirators sold 25 grams of methamphetamine to an undercover police officer, who recorded the transaction on audiotape. Suppose, however, that the Government additionally contends that the defendants also made a previous, unrecorded, 25-gram sale to a confidential informant of doubtful credibility. Under these circumstances, a reason- able factfinder might well have no reasonable doubt about the defendants' guilt of conspiracy, and might think it more likely than not that the conspirators distributed 50 grams of methamphetamine, but still harbor a reasonable doubt about whether the first transaction took place. Accordingly, if the Government was required to prove the requisite 50 gram quantity beyond a reasonable doubt, the defendants would not be subject to the mandatory minimum; if proof by a preponderance sufficed, they would be subject to it.

beyond the *maximum* sentence of twenty years applicable to any methamphetamine sale. However, the Government argued that under *Harris v. United States,* 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), it is constitutionally permissible for Congress to require the imposition of a mandatory minimum sentence of imprisonment based on facts found by the Court alone, applying a preponderance of the evidence standard of proof. Hence, while § 841(b)(1)(A)'s maximum sentence of life imprisonment (rather than 20 years under § 841(b)(1)(C)) could *not* be applied without a jury finding beyond a reasonable doubt of the required drug quantity, the same provision's mandatory minimum sentence of ten years (as opposed to the absence of a mandatory sentence under § 841(b)(1)(C)) could be constitutionally imposed based on a preponderance of the evidence finding by the judge alone.

Arias vigorously disagreed. According to Arias, Congress never intended that the drug quantities and amounts set out in § 841(b) would constitute mere "sentencing factors." Rather, he contended, Congress created a number of distinct drug offenses, with different elements. As to methamphetamine, Arias argued, Congress created three distinct offenses—in effect distribution of methamphetamine in the first, second, and third degrees—with corresponding sentencing ranges of ten years to life, five to forty years, and zero to twenty years, respectively. According to Arias's view of Congress's scheme, the nature and quantity of the drugs are elements of each distribution offense. If the Government fails to prove beyond a reasonable doubt the requisite quantity of the drug to establish guilt of the most serious offense, the defendant must be acquitted of that offense, and convicted (if at all) of the appropriate lesser-included offense. Under this interpretation, there is nothing whatever unconstitutional about the statute. The critical practical difference is that a jury (if demanded) rather than a judge, must find that threshold drug quantity was present, beyond a reasonable doubt, before the mandatory minimum sentence applicable to that quantity is required.

In the context of a bench trial, the procedure would be simpler, and the parties' approaches would divide elegantly. Under the Government's theory, assuming that the Government proved Arias guilty beyond a reasonable doubt of conspiring to sell drugs, the Court would then proceed to find the quantity of drugs involved by a mere preponderance of the evidence. If convinced by a preponderance of the evidence that the amount exceeded 50 grams, the Court would be required by law to impose a sentence of at least ten years (but no more than twenty, because the statutory enhanced maximum sentence could not be imposed absent a beyond a reasonable doubt finding). Under Arias's theory, if the Government failed to establish the requisite quantity of drugs beyond a reasonable doubt, the Court could convict him only of the lesser offense of conspiring to sell a smaller quantity of drugs, and would sentence Arias according to the principles set forth in 18 U.S.C. § 3553(a), taking into account the applicable Sentencing Guidelines, *see United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005), with the possibility that such sentencing could result in a sentence below ten years. Of course, if the Court were convinced beyond a reasonable doubt that the statutory quantity of drugs had been sold, the issue would be mooted and Arias would be subject to both the higher maximum sentence and the ten-year mandatory minimum under any interpretation of the law. The parties sought an in limine ruling on the

issue, and the Court expected to rule on the morning of the scheduled trial.

## II. *The Morning of Trial*

On the morning of trial, however, Arias arrived with a new defense attorney, and sought substitution of counsel and an adjournment of the trial.[3] The Court refused to grant the adjournment, recounting in detail the history of adjournments, all at the defendant's request, that had consumed nearly a year since indictment. (4/19/05 Tr. 4–6.) Noting that defendant's equivocation about whether to waive a jury had resulted in the calling of a jury panel, and that in view of the Court's calendar, a trial could not be held before the fast-approaching date the original prosecutor planned to leave Government service, the Court professed its readiness to proceed that day, "whether it [is] going to be a jury trial or a bench trial or a guilty plea and *Fatico* hearing." (*Id.* 7–8.) The Court indicated that it would permit new counsel to appear in the case only if the Court was convinced that new counsel fully understood the case, and Arias was fully advised of the risks of proceeding with a new attorney on such short notice and gave a "rock-solid waiver" of any issue regarding substitute counsel's lack of preparation. (*Id.* 8–9.)

The conversation then returned to the question of the Government's burden of proof. The Court indicated its view that if the case were tried to a jury, the jury would have to be asked whether it found the charged drug quantity beyond a reasonable doubt, because under *Apprendi* such a finding would be necessary to permit a sentence in excess of 20 years, and the Court did not believe that "the [G]overnment can waive the Court's power to impose a sentence beyond 20 years if that sentence is legally available and ... appropriate." (*Id.* 11–12.) If the jury found the defendant guilty but did not find the charged quantity beyond a reasonable doubt, then under governing Second Circuit law (as explained more fully below), the Court would have to determine the drug quantity by a preponderance of the evidence, and would be required to impose a mandatory minimum if the amount so found exceeded the statutory threshold. (*Id.* 12–13.) At a bench trial, the Court would determine both guilt or innocence and quantity, but by different standards of proof. (*Id.* 13.)[4]

The Court thus accepted the Government's position—that under Second Circuit precedent, the amount of controlled substance distributed was not an element of the offense, but a sentencing factor, and therefore the Government need only prove the amount by a preponderance of the evidence in order for a mandatory minimum sentence to apply. Stated another way, the defense would not be able to avoid a mandatory minimum sentence by raising a reasonable doubt before a jury about the drug quantity.

As the subsequent proceedings made clear, while the Court's ruling disadvantaged the defense in the context of a trial, consistent application of the principle presented an advantage for the defense in the context of a guilty plea. If the nature and quantity of the drug sold is an element of

---

**3.** Arias had been represented by Richard D. Boulware, Esq., a federal defender. At the time of his arraignment approximately a year earlier, the defendant had expected that he would retain Paul S. Brenner, Esq., but Mr. Brenner was not actually retained until the eve of trial. (4/19/05 Tr. 2–4.)

**4.** The Court had indicated several times in the course of colloquy on this issue that if the question had not been foreclosed by Circuit precedent, it would be inclined to agree with Arias's interpretation of the statute.

the offense, then the defendant, to enter a valid guilty plea, would presumably have to allocute to those facts to enter a valid plea, and thus would be unable to challenge the application of the mandatory sentence later.[5] If, however, as the Government had insisted in connection with the proposed trial, the conspiracy offense was a unitary crime, established by proof simply of conspiring to distribute some quantity of some drug, then a defendant could validly plead guilty by admitting only those elements, and could argue to the judge at sentencing that the amount was not so great as to require imposition of the mandatory sentence. Though the quantity would only have to be proved by a preponderance of the evidence, it would have to be proved, and the defendant could plead guilty and still preserve the issue for a later factual hearing. The Government expressly assented to this view of the matter. (*Id.* 17–18.)

After some discussion of the timing for a potential *Fatico* hearing should the defendant choose to plead guilty, the Court adjourned the proceedings for an hour to permit Arias to confer with both his attorneys and to advise the Court as to his preferences with respect to counsel and with respect to proceeding to trial. (*Id.* 22.)

### III. *The Guilty Plea*

After the recess, the defense team advised the Court that Arias wished to plead guilty. The Court allowed new counsel to appear as co-counsel, "so that it would be clear that if the defendant chooses to take such a momentous step as [pleading guilty] that he does it with the advice of both the attorney who has been on the case for a long period of time and [of] counsel of his

choice, so that there would be no issue that he has been prejudiced by any last minute change." (*Id.* 22.)

The Court proceeded to advise the defendant of his rights in accordance with Fed.R.Crim.P. 11(b)(1). When it came time to advise Arias of the elements of the offense, the Court noted that Arias was charged "with conspiracy to distribute or possess with intent to distribute methamphetamine." (*Id.* 33.) At this point, Arias's original defense attorney interrupted, noting that Arias planned "not ... to allocute with respect to the actual drug, [but rather] simply ... with respect to a violation of the narcotics laws." (*Id.*) Without objection from the Government, the Court responded, "Okay. I think that's subsumed within the discussion that we've had before. I thought the issue was only the amount but if there is a question with respect to the nature of the drug, I guess that's covered by the same reasoning ... [that] the elements of the offense ... just have to do with conspiracy to distribute a controlled substance." (*Id.* 34.)

With respect to the sentencing consequences, the Court advised the defendant that although the maximum sentence for the crime charged in the indictment was life imprisonment, "because you're not specifically admitting that to that amount of that drug, ... it would be unconstitutional to impose any sentence beyond 20 years." (*Id.* 36.) With respect to the mandatory minimum, the Court outlined that the Government maintained that the mandatory minimum applied if the Court found the requisite drug quantity by a preponderance of the evidence, and that Arias's lawyers argued that "since you haven't been found guilty by a jury of possessing [the

---

5. Of course, the defendant could admit to a lesser included offense of distributing a lesser quantity of drugs, but the Government could still insist on a trial on the more serious charge.

required] amount of drug, since you are not admitting to possessing that amount of that drug, that there is no mandatory minimum." (*Id.* 41.) The Court then made emphatically clear that in its view, the Government was correct, although the defendant was preserving his right to appeal the issue:

> Now, I want you to be very clear on what my position is on this. My position is that I am bound, by preceden[ts] from a higher Court, to follow the [G]overnment's view of this. I have made no secret of the fact that I think those precedents are wrong but it doesn't matter what I think. What matters is what they think upstairs. So, the law, as I am articulating it to you, is that there is a mandatory minimum of 10 years, not based on what [you have admitted] so far[.][I]t's contingent. It depends on whether I find those facts at a hearing to be held later . . . .
>
> So, you understand that you have got a legal argument that the mandatory minimum will not apply, period, no matter what I find are the facts, but so far that legal argument is a loser and it depends on convincing the Court of Appeals to change [its] mind. At this moment, if I find that the facts are what the [G]overnment says they are, then you are exposed to the risk of a 10-year mandatory minimum sentence and you understand that?

(*Id.* 41–42.) The defendant agreed that he understood. (*Id.* 42)

As noted above, Arias eventually admitted, in abstract terms, that he had "knowingly conspire[d] with other persons to distribute a controlled substance" (*id.* 48), and the Court accepted his plea. Almost immediately, however, the parties' different positions about the effect of the plea

appeared to expand. As the Court had indicated early in the allocution, most of the discussion about the standard of proof during the pre-trial phase of the case had concerned drug *quantity*. Until midway through the allocution, the Court had not been aware that there was any issue about the *nature* of the drug involved.[6] Although much of the abstract discussion referred to whether the "nature and quantity" of the controlled substance was an element of the offense, the concrete discussion was always in terms of the number and size of the transactions, and whether the amount of drug distributed reached the 50-gram threshold. It was only when the elements of the crime were being set forth that the Court for the first time became aware that defendant would insist on allocuting to a conspiracy to distribute an abstract "controlled substance," and not the particular substance specified in the indictment.

While defense counsel raised the point in reference to the elements of the offense, however, the defense took no issue with the Court's description of the penalties involved, and the issues that defendant intended to preserve for appeal. The Court clearly stated, without objection from the defense, that the maximum sentence would be twenty years in prison, because—defendant having failed to allocute to the quantity of drugs—a higher sentence would be inconsistent with *Apprendi.* (4/19/05 Tr. 46–47.) The clear predicate of that discussion was that Arias had admitted all the elements of a conspiracy to violate 21 U.S.C. § 841(b)(1)(C), which carries a maximum sentence of twenty years.

Nevertheless, after the plea had been accepted and a sentencing date set, the

---

**6.** Indeed, it is not clear to the Court even now that there is a *factual* issue as to whether the

drug involved was or was not methamphetamine. *See* 4/19/05 Tr. 57–59.

defense took a different view. Arias having been on bail pending trial, the Government asked that he be detained pending sentence, invoking a statute which sets strict limits on the release pending sentence of any defendant who has been convicted, insofar as here applicable, of any controlled substance offense for which the maximum term of imprisonment is ten years or more. *See* 18 U.S.C. 3143(a)(2) (incorporating offenses specified in 18 U.S.C. § 3142(f)(1)(C)). Arias's original attorney, however, argued that this provision was inapplicable, because under the theory that Arias had pled guilty only to the necessary elements of the generic crime of conspiring to violate 21 U.S.C. § 841, the nature as well as quantity of the drug were mere sentencing factors, to which Arias had not admitted and which were yet to be found by the Court. Accordingly, it remained theoretically possible that Arias had distributed only a small quantity of marijuana, and thus, on the basis of Arias's allocution, he could be found subject to a maximum sentence of as little as five years, under 21 U.S.C. § 841(b)(1)(D). On that view, he would not fall within the restrictive bail release provisions of 18 U.S.C. § 3143(a)(2). (4/19/05 Tr. 55–57.)

Although the Government and the Court were taken aback by the defense's novel argument, the defense's logic appeared to follow from the Government's original position that the nature and quantity of the controlled substance involved were not elements of the offense of conviction. Accordingly, the Court explicitly accepted, and the Government acquiesced in, the defense argument with respect to bail. (*Id.* 55–56, 59.) But the Court immediately identified a tension between the defense's position with respect to bail and the understandings with respect to sentence on which the plea had been taken. Thus, the Court noted that it was unaware of any genuine issue about the nature of the drug involved:

> I appreciate we kept the word "methamphetamine" out of this. I understand there is [a] good faith dispute as to the parties' a[cc]ount of quantity of the drugs involved[,] ... [but] I have not heard anybody suggest that there really is a good faith dispute about the nature of the drug. Now, I accept that there has been an allocution that was acceptable to the [G]overnment of the most abstract version of this offense. I don't hold it against the defense in any way, I don't take this as playing cute, although I see that in a certain way it is. But I take it there is not going to be any playing cute at the hearing.

(*Id.* 58.) Both defense attorneys then indicated, albeit less than explicitly, that they did not anticipate disputing at sentencing that the drug involved was in fact methamphetamine. (*Id.* 58–59.)

The Court then noted that "we did have that whole discussion of sentencing on the assumption that the maximum was going to be 20 years." (*Id.* 59.) At that point, the prosecutor began to recognize the key problem: if the defendant had pled to elements that only warranted a potential maximum sentence of five years, with the task left to the Court of finding facts that would justify a 20-year sentence, a sentence beyond five years could violate the right to trial by jury elaborated in *Apprendi* and *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). The prosecutor accordingly sought a waiver of any *Blakely* argument. (*Id.* 59–60.)

In response, the Court engaged in the following colloquy with the defendant and counsel:

> THE COURT: Are we absolutely in agreement that the maximum sen-

tence to which the defendant is exposed by this plea is 20 years?

[ORIGINAL DEFENSE COUNSEL]: Your Honor, I am in agreement with that.

THE COURT: Okay. And Mr. Arias, you understand that by pleading guilty you are exposing yourself to the risk of punishment of up to 20 years, that's what we said before and that remains the case? You understand that?

THE DEFENDANT: Yes.

(*Id.* 60.) The Government then asked that the Court phrase the question to the defense as whether "there is a waiver of any jury determination" of the drug quantity. (*Id.*) When the Court asked the defense whether it would waive a jury determination of the drug quantity, the defense responded that it was "not prepared to waive that ... [because it is not] necessary under Rule 11." (*Id.* 62.) But when the Court asked, "Well, then, aren't you telling me that under this plea, in your view, the maximum sentence that could be imposed is five years and that Mr. Arias was misinformed by the Court in being told that the maximum sentence was 20 years?," defense counsel denied taking that position. (*Id.* 63.)

At this point, both the defense and the prosecution appeared to be caught in contradictory positions. The defense declined to waive any jury trial right, because it hoped to maintain in the Court of Appeals the position that drug quantity was an element of a violation of 21 U.S.C. § 841(b)(1)(A), and hence that the quantity needed to be found by a jury beyond a reasonable doubt in order for the ten-year mandatory minimum sentence to apply (*id.* 63–64); but, at the same time, the defense (notwithstanding the clever effort to extricate Arias from detention pending sentence) believed that it had negotiated a

plea with a maximum sentence of twenty rather than five years (*id.* 62). On the other hand, the Government was left arguing somewhat incoherently that while a guilty plea "not only open as to quantity but also open as to quality of the controlled substance" "could be acceptable under some circumstances, ... and I readily admit that the permutations to this are very muddled," such that the result is "sometimes element, sometimes not an element, the implication of that ... depends upon what is happening before the District Court and what is being either sought by the Government or the Court in terms of the imposition of a sentence." (*Id.* 65, 68.)

The Court ultimately ruled as follows:

Well, I think we are going to leave it at the following: ... [T]he clear implication of the Second Circuit[,] however they've gotten there, [is] ... that the maximum is 20 years and the mandatory minimum is 10 ... in cases where the Court finds by a preponderance of the evidence what the quantity and nature of the drug is. That seems to me to be the law of the circuit. That's what I have advised the defendant of. He has pled guilty acknowledging that his anticipation is that he could be sentenced to as much as 20 years and his understanding that under the current law of the circuit, if the Court finds that there is 50 grams or more of methamphetamine, a mandatory minimum of 10 years would apply.

(*Id.* 68–69.)

## IV. *The Instant Motion*

One week later, the Government asked the Court to withdraw its acceptance of the guilty plea, because "[w]ithout disputing that such an allocution [to generic distribution of a controlled substance] might for some crimes be proper, the defendant did not plead guilty to the crime charged

in *this Indictment,*" that is "a conspiracy to distribute, and possess with intent to distribute, 50 grams or more of crystal meth, in violation of 21 U.S.C. § 812, 841(a), and 841(b)(1)(A)." (Schreibman Letter 8; emphasis in original.) The Government appears to maintain that it can "insist on an appropriate allocution, or the defendant's waiver of a jury determination of that fact ['that the quantity of crystal meth involved did in fact exceed 50 grams'], before a plea may be accepted." (*Id.*) However, it is unclear whether the Government means to "insist" on an allocution as to *quantity.* Its ambiguous bottom line is that "[i]f the defendant is not prepared to allocute his guilt to *that crime* [*i.e.,* the crime charged in the Indictment, which the Government apparently defines as conspiracy to distribute *50 grams* or more of methamphetamine], or waive his right to a jury determination of *drug type,* the Government respectfully submits that he has not pled guilty to the crime charged in the Indictment and that a trial is required." (*Id.;* emphasis added.)

## DISCUSSION

Each party to this litigation has taken somewhat inconsistent positions as to whether drug quantity and type are elements of the offense of distribution of a controlled substance under 21 U.S.C. § 841(b)(1)(A) (and conspiracy to violate that statute), or whether those are merely sentencing factors that come into play when a defendant has been convicted of the generic offense of distributing some controlled substance in violation of 21 U.S.C. § 841(a). That is perhaps surprising, in view of the fact that at the time of the above-described proceedings, there was apparently clear and long-standing Second Circuit law holding that drug quantity, at least, is a sentencing factor and not an element of the offense. *United States v. Campuzano,* 905 F.2d 677 (2d Cir.1990);

*United States v. Luciano,* 311 F.3d 146 (2d Cir.2002).

The confusion is the product of two forces: one legal and one practical. The legal problem is that the Second Circuit's position, as derived from the cited cases, is difficult to defend logically. The practical problem is that, as exemplified in this case, both the Government and criminal defendants have incentives to take different views of the case depending on the procedural posture of the case and the tactical interests of the parties.

## I. *What is At Stake?*

It is important to understand what is at stake in deciding the question. In the federal jurisdiction, all crimes are defined by statute. *United States v. Hudson & Goodwin,* 11 U.S. (7 Cranch) 32, 3 L.Ed. 259 (1812). Since the Constitution commands that a defendant may not be convicted of a crime unless the Government proves him guilty beyond a reasonable doubt, *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), before a jury, U.S. Const. Amend. VI, every "element" of such crimes—that is, every substantive component of the statutory definition of the offense—must be proved to the satisfaction of a jury (or admitted by a defendant who waives a jury trial and pleads guilty) for the conviction to be valid. Generally, defining the elements of criminal conduct is a matter of legislative prerogative, subject only to very limited constitutional restrictions.

At the same time, crimes have traditionally been defined very broadly, in ways that cover different acts, under different circumstances, that vary in culpability and harmfulness. Until the advent of sentencing guidelines and similar regimes, legislatures commonly dealt with this problem by setting relatively high maximum sentences

for the crimes they defined, and leaving it to sentencing judges to weigh the various aggravating and mitigating circumstances of particular instances of crime, and impose sentence in their discretion on particular cases. Significantly, since these circumstances were not defined by statute, but were left to the discretion of judges, it was also left to judges, by a lesser preponderance of the evidence standard, to determine the factual questions about such factors that were not offense elements, but mere aggravating or mitigating factors bearing on sentencing.

The sentencing reform movement of the 1970s and 1980s attempted to deal with inconsistency among judges in making these sentencing decisions by defining particular "sentencing factors" and attaching absolute or presumptive sentencing weight to such factors in guideline or mandatory sentences. In the process, however, legislatures explicitly or implicitly left in place the traditional fact-finding systems: statutorily defined offense elements had to be proven to a jury beyond a reasonable doubt or admitted by plea of guilty, while mere "sentencing factors," even if defined by statute or guideline, were found by judges on a preponderance standard.

The Supreme Court added a further level of complexity to this structure when it addressed the constitutionality such regimes. While the Court upheld the constitutionality of statutes that attached a mandatory minimum punishment to a defined sentencing factor found by a judge on a lessened standard of proof, *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986); *Harris v. United States*, 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), it ruled that legislatures could not, in the guise of sentencing reform, attach a consequence that increased the potential punishment above an otherwise-defined maximum unless the fact that triggered the increased sentence was found by a jury beyond a reasonable doubt (or admitted by guilty plea). *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435; *Blakely*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403.

Thus, determining whether a fact must be proven to a jury (or admitted for a valid plea) is a two-step process. First, the court must interpret the statute itself. Any fact that is a condition of guilt of the crime defined by the statute is an "element of the offense" and must be proven beyond a reasonable doubt at trial by jury for a valid conviction, or admitted by the defendant for the entry of a valid plea of guilty to that crime. If a defendant is properly found guilty of an offense, or validly pleads guilty, under that standard, he is subject to punishment up to the maximum sentence authorized on that conviction, although the actual punishment, including the application of any mandatory minimum sentence, can be determined based on facts found by the judge by a preponderance of evidence. Second, however, if the legislature has purported to attach an escalating scale of maximum penalties to the crime of conviction, the statute is unconstitutional to the extent that it would permit a higher maximum term based on facts not included in the verdict or plea. Accordingly, for an enhanced maximum sentence to apply, the fact that triggers the enhanced maximum sentence must effectively be treated *as if* the legislature had defined it as an element of a separate crime, and proven to the jury or admitted at the plea, if the prosecution seeks a higher sentence.

The problem becomes complicated where, as in the federal narcotics statutes, Congress has defined a single fact that *both* sets a mandatory minimum sentence *and* increases the maximum punishment available. If in doing so, Congress intended to create separate offenses with sepa-

rate elements—for example, one crime of distributing any amount of cocaine, with a sentencing range of zero to twenty years, and a separate crime of distributing five kilos or more of cocaine, with a sentencing range of five to forty years—there is no problem. Because the distribution of a particular quantity of cocaine is by legislative definition an element of a distinct, more serious, crime, it must be proved to the jury or admitted at plea in order for a defendant to be found guilty of that crime. If, however, Congress intended to create a single, unified crime of "distribution of a controlled substance," with the punishment to depend on legislatively-defined "sentencing factors" including the quantity of the drug and, for that matter, what substance was involved, a defendant could be found guilty of a crime *without* a jury finding or admission of these factors; at the same time, while the minimum authorized sentence could constitutionally turn on a judge's finding of the facts, the maximum constitutional punishment would be determined by the facts found by the jury or admitted at plea.

## II.   *The Second Circuit Case Law*

Until just one month ago, the law of the Second Circuit on these questions was fixed by three cases. Before the constitutional limitations on "sentencing factors" were articulated by the Supreme Court, the Second Circuit held in *Campuzano*, 905 F.2d 677, that 21 U.S.C. § 841 created such a single unified offense; after *Apprendi*, in *United States v. Thomas*, 274 F.3d 655 (2d Cir.2001), the Circuit applied *Apprendi* to find § 841 unconstitutional insofar as it triggered an increased maximum sentence by judicial fact-finding of its

"sentencing factors"; and in *Luciano*, 311 F.3d 146, it adhered to its prior interpretation of the statute, and upheld its constitutionality insofar as it established a mandatory minimum sentence. Thus, at the time of the above-described proceedings, it appeared that the Second Circuit's case law clearly provided that a defendant could plead to or be found guilty of a generic violation of § 841(a); under *Campuzano*, that was the only crime defined by the statute. Under *Luciano*, a defendant who pled to or was found guilty of that generic violation could be subject to a mandatory minimum sentence based on a judicial finding of the requisite drug type and quantity, since Congress had intended these findings to be made by the Court by a preponderance of the evidence, and this procedure was constitutional under *Harris*. At the same time, under *Thomas*, the defendant could only be sentenced beyond the statutory maximum for the lowest grade of § 841 offense if the jury found (or the defendant admitted in a guilty plea) the requisite drug type and amount, because to sentence beyond the lower maximum based on a judge's finding of a more serious offense would violate *Apprendi*.

Since the entry of Arias's purported plea, however, the Circuit has taken a new direction. In *United States v. Gonzalez*, 420 F.3d 111, 133–34 (2d Cir.2005), the Court ruled that "[t]he drug quantities specified in 21 U.S.C. § 841 are elements that must be pleaded and proved to a jury or admitted by a defendant to support any conviction on an aggravated drug offense, not simply those resulting in sentences that exceed the maximum otherwise applicable."[7] Under *Gonzalez*, it would appear

---

**7.** Ironically, in *Gonzalez*, the defendant and the Government took exactly opposite positions to those taken by the Government and the defendant in this case. In *Gonzalez*, the defendant wished to withdraw his plea, and

accordingly argued that the plea, in which he did not admit the aggravated amount of crack cocaine, was invalid; the Government, defending the conviction, stoutly maintained that the plea was valid. In this case, defen-

to follow *a fortiori* that if the quantity of the drug distributed must be admitted in order for a valid plea to be entered, the nature of the drug distributed must also be admitted.

Little can be taken for granted, however, in such a confused area of law. The Circuit has not directly addressed the precise question before this Court, which concerns drug type rather than drug quantity. The Second Circuit's conclusion, moreover, appears to have been based on a reconsideration of the effect of *Apprendi* and *Booker* on statutes that set both enhanced maximum and mandatory minimum terms, rather than on a re-interpretation of the statute itself.

■ A detailed study of the statute's drafting history, however, compels the conclusions that (1) the Circuit's former interpretation of § 841 as creating a single offense accompanied by a congeries of sentencing factors was erroneous; (2) the Circuit's conclusion in *Gonzalez* that drug quantity must be treated as an offense element is correct not merely as a matter of constitutional law but as a matter of statutory interpretation; and (3) the same result must obtain with respect to drug type. On a proper understanding, both drug type and drug quantity (as well as certain other facts made relevant by particular branches of § 841(b)) are elements of the various separate and distinct offenses created by that statute, which must be proved to a jury beyond a reasonable doubt, or admitted in a plea allocution, in order for a defendant to be convicted of one of the aggravated crimes defined in the statute.

## III. *Element of Crime or Sentencing Factor?*

### A. *Statutory Structure and Legislative Intent*

If the statute's language and history are read with fresh eyes, it is plain that § 841(b)(1) creates four different levels of crime, depending on the type and quantity of controlled substance distributed. Such a statutory scheme is not unusual in American criminal law, in which generic crimes like burglary, robbery, rape, or murder are commonly divided into degrees based on the presence or absence of factors that aggravate the basic version of the offense. In virtually all such cases, a jury must decide which degree of crime was committed, and must find aggravating elements beyond a reasonable doubt.

The principal argument relied on by the Government in its usual contention that drug quantity under this statute is a mere sentencing factor[8] is that the division between § 841(a) and § 841(b) marks a distinction between the prohibition of behavior in § 841(a) ("it shall be unlawful for any person knowingly or intentionally . . .

---

dant, seeking the benefit of a lower statutory maximum sentence, insists that he has validly pleaded guilty to a crime, but the Government, seeking to preserve the possibility of a higher sentence, argues that Arias's plea is invalid for failure to admit the nature of the drug distributed, which it maintains is an element of the offense charged.

**8.** This is the position routinely advanced by the Government in cases in this Court, and advanced in the Second Circuit decisions cited above. The Government also took this position in this case, during the discussions over the burden of proof at the anticipated bench trial. As noted above, the Government has taken a somewhat modified position in seeking withdrawal of the Court's acceptance of Arias's guilty plea; however, the Court does not understand the Government to recede from the position that drug quantity is a sentencing factor under the statute, and that the defendant does not need to allocute to any particular quantity of a controlled substance in order to enter a valid plea of guilty to a violation of 21 U.S.C. § 841(a).

[to] distribute ... a controlled substance") and a sentencing structure in § 841(b) ("any person who violates subsection (a) ... shall be sentenced as follows"). But it is completely ahistorical to attribute the subdivision of the statute to a distinction— between "offense elements" and "sentencing factors"—that rose to prominence only in the late 1980s.

The structure of § 841 has been fixed since the Comprehensive Drug Abuse Prevention and Control Act of 1970 (also known as the "Controlled Substances Act"), Pub.L. 91–513, § 401, 84 Stat. 1242, 1260–62. That statute, intended to modernize and systematize the various federal prohibitions against illegal drugs, created § 841 in essentially the form in which we know it today. The basic prohibition of distributing illegal substances was set forth in subsection (a), and a penalty scheme that differentiated punishment for distributing various drugs was set forth in subsection (b).

But at the time of the statute's creation over three decades ago, the division between subsections (a) and (b) did not reflect a distinction between elements that must be proven to the jury beyond a reasonable doubt and sentencing factors that can be found by a judge on a lesser standard of proof. Sentencing law was then marked by very broad judicial sentencing discretion, in which the legislature set high statutory maximum penalties, and judges were given free rein to sentence different offenders according to the judges' assessment of the offenders' individual prospects for rehabilitation. *See* Marvin Frankel, *Criminal Sentences: Law Without Order* (1972) (describing unregulated and indeterminate sentencing system of the 1970s). It was against this system that the sentencing reforms of the 1980s, with their mandatory sentences and sentencing guidelines, rebelled. In 1970, "sentencing factors" were simply those facts about the offense or the offender that judges took into account, to the extent they believed it appropriate to do so, in exercising their sentencing discretion. This Court is not aware of any federal statute in existence in 1970 that differentiated two or more ways of committing a generic offense, of greater and lesser degrees of seriousness, and that, by express legislative statement or judicial interpretation, required a judge to find the differentiating fact by a preponderance of the evidence.

The very terminology that the Government and the Second Circuit have confidently applied to this statute does not seem to have existed in 1970. One looks in vain for any use of the term "sentencing factor" in the sense in which the Government would have it apply in any federal appellate case concerning § 841 from 1970 through 1987. To a generation accustomed to the sentencing guidelines regime imposed by the Sentencing Reform Act of 1984, legislatively-imposed guidelines specifying the precise weights to be assigned to various "sentencing factors" to be found by judges, for use in assigning particular sentences within the broad limits of a mandatory minimum and a statutory maximum, seems perfectly familiar. But such a regime would have been unusual, indeed revolutionary, in 1970, and Congress gave no indication in the language of § 841 or in its legislative history that its formulation of § 841 was intended to create any such innovation.

Indeed, in the very same statute, Congress was careful to state its intention explicitly when it instructed that a factual determination be left to the judge at sentencing. For example, in creating a sentencing enhancement based on recidivism, the former 21 U.S.C. § 849, Pub.L. 91–513, 84 Stat. 1266 (enhancing sentences for "dangerous special drug offenders"), Con-

gress made clear that the determination of contested issues regarding the existence of prior convictions were to be resolved "after conviction but before pronouncement of sentence," former 21 U.S.C. § 851(b), Pub.L. 91–513, § 411, 84 Stat. 1269–70, in a "hearing ... before the court without a jury." Former 21 U.S.C. § 851(c)(1), *id.* Congress made this departure from the normal process of jury factfinding carefully and explicitly, even though determinations of a defendant's prior criminal record in connection with sentencing were traditionally matters for the court, and—even in the present era of greater caution about incursions into the jury trial right—constitute an exception to the *Apprendi* principle. *See Almendarez–Torres v. U.S.*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). In light of the treatment of this recidivist provision, it is even less imaginable that Congress intended, without giving any indication of its intentions, to dispense with jury factfinding in an area where such a dispensation would have been far more controversial and innovative.

Moreover, neither as it existed in 1970 nor as it exists today does § 841 reflect the pattern of a sentencing guideline. The Sentencing Guidelines operate to control judicial discretion within the upper and lower boundaries of sentences set by the legislature. As applied to mail fraud, for example, Congress created a lower boundary (zero) and an upper boundary (20 years), for imprisonment terms. *See* 18 U.S.C. § 1341. Once a jury has found beyond a reasonable doubt that a defendant has committed all of the elements of the offense that subjects him to that range of punishment, the Sentencing Guidelines then establish a variety of sentencing factors, to be found by the judge, which determine a much narrower range (once mandatory, today recommended) for the appropriate sentence.

The Supreme Court has encountered state regimes in which a statutory factor operates in a similar way, to establish a mandatory minimum sentence within (or an enhanced maximum sentence beyond) the range set by the legislature for an ordinary offense. Thus, in *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), the Pennsylvania legislature had established an ordinary range of zero to ten years for the crime of aggravated assault, *id.* at 87, 106 S.Ct. 2411, then created a separate rule that required a mandatory minimum term of five years where the defendant "visibly possessed a firearm" during the commission of the offense. The mandatory minimum provision "neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty *within the range already available to it.*" *Id.* at 87–88, 106 S.Ct. 2411 (emphasis added). Moreover, the Pennsylvania legislature "expressly provided that visible possession of a firearm is not an element of the crimes enumerated in the mandatory sentencing statute, ... but instead is a sentencing factor that comes into play only after the defendant has been found guilty of one of those crimes beyond a reasonable doubt." *Id.* at 85–86, 106 S.Ct. 2411. The (unconstitutional) provision in *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, attempted to create a similar scheme at the upper end of a statutory sentencing range. There, New Jersey had created a statutory penalty range of five to ten years for the crime of possession of a firearm for an unlawful purpose; the legislature then added, as a "sentencing factor" to be found by the judge by a preponderance of the evidence, the factor of "biased purpose"

that would double the ordinary maximum. *Id.* at 468–69, 120 S.Ct. 2348.

The sentencing provisions of § 841, however, do not operate in this way. The factors set forth in § 841(b) do not instruct judges where to sentence within (or beyond) a "normal" range set for violating a statute. Rather, they provide *the only statutory sentencing ranges that exist* for violations of § 841. Unlike the mandatory minimum in *McMillan,* the presence of 50 grams of methamphetamine does not trigger an instruction to the judge to sentence the defendant to a specific minimum term (ten years) within the general range otherwise provided for the offense of distributing a controlled substance, since *there is no such range.* Neither § 841(a) nor § 841(b) sets a basic sentencing range for all violations of § 841(a), which can then be enhanced or subjected to mandatory minimums based on particular factors that aggravate the basic offense. Rather, the separate subsections of § 841(b) themselves establish the entire statutory punishment range for each variation on the general theme of manufacturing or distributing of controlled substances. These ranges vary from the mandatory minimum of ten years and statutory maximum of life, which applies to the defendant who is convicted of distributing 50 grams or more of methamphetamine (or other quantities of other illegal drugs) to the completely different ranges applicable to offenders who commit the quite different offenses of distributing one gram or more of LSD (5 to 40 years, 21 U.S.C. § 841(b)(1)(B)(v)), distributing any amount of a schedule IV substance (0 to 3 years, 21 U.S.C. § 841(b)(2)); polluting an aquifer in the course of manufacturing a controlled substance (0 to 5 years, or a fine, 21 U.S.C. § 841(b)(6)); or distributing a controlled substance to an unwitting victim as a method to accomplish rape (0 to 20 years, 21 U.S.C. § 841(b)(7)).

The very range of these offenses casts significant doubt on any claim that § 841(b) merely lists sentencing factors to be taken into account in sentencing those who commit the single crime of distributing a controlled substance. Although the question is typically discussed in terms of whether drug *quantity* is an offense element or sentencing factor, the drug quantities that affect the sentencing ranges for manufacturing or distributing such drugs as heroin, cocaine, and methamphetamine under § 841(b)(1)(A)-(C) are defined in provisions that are structurally identical to the various subsections that define different penalties for the possession of other drugs and for aggravated offenses related to manufacturing and distributing narcotics such as the date-rape and pollution offenses described above. If drug quantity is not an element of a separate offense, but a mere sentencing factor, then it is difficult to understand why the nature of the controlled substance involved, or any of the other factors that bear on the seriousness of the different forms of conduct described in § 841(b), are not also sentencing factors, that need not be stated in an indictment, tried before a jury, or proved beyond a reasonable doubt.

The position that these multifarious provisions of § 841(b) do not define different crimes, of varying degrees of seriousness, which carry entirely distinct statutory sentencing ranges, but merely provide a set of sentencing guidelines with occasional mandatory minimums or enhanced maximums, is difficult to defend. Rather, the Sentencing Guidelines operate to define and control the "sentencing factors" that dictate the particular sentence to be imposed on particular offenders who commit these various offenses, just as they do for every other crime in the federal criminal code. *Within* the statutory range for the statutory crime of distributing over 50 grams of

methamphetamine, the guidelines set forth more specific sentencing factors that produce a recommended sentence, the presence or absence of which is determined by the judge. The provisions of § 841(b), in contrast, provide the elements that must be found by a jury, in order to determine the outer boundaries of the offense committed, and of the statutory maximum and minimum punishments for that offense. Moreover, unlike the statutes in *McMillan* and *Apprendi,* where the legislature specified its intention (found constitutional in *McMillan* but constitutionally prohibited in *Apprendi* ) to permit judicial factfinding by a reduced burden of proof, neither the 1970 Act of Congress that first adopted § 841 nor the subsequent statutes that have amended and elaborated on the various drug offenses created by that section suggests any intention to have the controlling facts determined by anyone other than a jury, by anything other than the traditional constitutional standard of proof beyond a reasonable doubt.

This conclusion is particularly clear with respect to the simple scheme established by Congress in 1970. At that point, the number of different provisions within § 841(b) was much smaller. Except with respect to marijuana, where there was an escalated penalty for distribution of very large quantities (*compare* former 21 U.S.C. § 841(b)(6) (distribution of more than 1000 pounds of marijuana punishable by up to 15 years' imprisonment) *with* former § 841(b)(1)(B) (distribution of marijuana punishable by up to 5 years' imprisonment)), drug quantity was not a factor in distinguishing the different types of conduct prohibited by § 841. Rather, the principal distinction between the different

penalties provided for different conduct concerned the identity of the drug distributed. The Court is unaware that any court or commentator, in the years before the next major amendments to the statute in 1984, ever suggested that distributing heroin was not a distinct offense from distributing marijuana, but that § 841(a) created a single offense of "distributing a controlled substance" with the nature of the substance a mere "sentencing factor" to be found by the judge at sentencing. Nor is the Court aware any practice, in those years, of omitting the specific drug allegedly distributed from the indictment, or instructing the jury that it was to decide beyond a reasonable doubt only whether the defendant had distributed a controlled substance, or permitting the judge at sentence to decide by a preponderance of the evidence what the nature of the substance was. There certainly is no indication in the text or legislative history that Congress intended, by dividing the statute into subsections (a) and (b), to permit or promote any such practices. But the argument that the subdivision of the statute into two sections reveals an intention to make the statutory amounts into "sentencing factors" assumes that the division into subsections was adopted in 1970 in contemplation of precisely such a nonexistent practice.

There is thus no reason to believe that either the existence of the subdivisions, or the titles ("unlawful acts" and "penalties") attached to them,[9] were intended by Congress in 1970 to signal different factfinders or burdens of proof with respect to the elements defined in each subsection.

---

**9.** Indeed, it seems that the captions or titles on subsections (a) and (b) are not even part of the enacted statute, but are compiler's notes inserted into the United States Code. *See, e.g.,* Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, § 401, 84 Stat. 1242, 1260–62. The statute as enacted in 1970 instead contains a title above the entire section that says "Prohibited Acts A— Penalties."

## B. *Constitutional Doubt*

■ If the language, structure, and history of the statute were not clear enough, there is yet a further reason to interpret the different provisions of § 841(b) as defining offense elements. Where there is any doubt about its meaning, a statute should be interpreted to accord with the Constitution, not to violate it. *Clark v. Martinez*, 543 U.S. 371, 125 S.Ct. 716, 724–25, 160 L.Ed.2d 734 (2005) (articulating "the canon of constitutional avoidance" in statutory interpretation); *Almendarez–Torres*, 523 U.S. at 237–38, 118 S.Ct. 1219 (same). Yet to interpret § 841(b) as defining only "sentencing factors" is to assume—without any warrant in the language, structure, or legislative history of the statute—that Congress intended to create an unconstitutional statute. The factors in § 841(b), such as drug type and quantity, affect not only mandatory minimum sentences, but also the statutory maximum sentence. Accordingly, as the Second Circuit held in *Thomas*, 274 F.3d 655, if these factors are interpreted as having been intended by Congress to be found by a judge by a mere preponderance, rather than by a jury beyond a reasonable doubt, they are to that extent unconstitutional under *Apprendi*.

It is unclear what, if anything, justifies interpreting a statute that is at best ambiguous or silent as to the intended factfinding procedure (let alone a statute that, as discussed above, history suggests was *not* intend to create mere "sentencing factors") in a way that makes it unconstitutional in fully half of its provisions. But this is exactly how our Court of Appeals, like most of its sister circuit courts, interpreted the statute for some time. Having first erroneously interpreted the statute as intended to require judicial preponderance factfinding, *Campuzano*, 905 F.2d 677, the Court of Appeals was then forced to declare the enhanced maximum terms for large quantities of drugs unconstitutional under *Apprendi*. *Thomas*, 274 F.3d at 663. For the moment at least, legislatively imposed mandatory minimum sentences may constitutionally be based on non-jury, preponderance-of-the-evidence factfinding. *See Harris*, 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524. Insofar as § 841(b) imposes mandatory minimum sentences, the statute as the Government wants to read it is thus constitutional. *Luciano*, 311 F.3d 146. But the result is a truncated statute: where Congress intended a tripartite methamphetamine prohibition with terms of zero to twenty years, five to forty years, and ten years to life, the Government's proposed reading, as accepted and then ruled partially unconstitutional by the courts of appeals, has resulted in sentencing ranges for larger quantities of five to twenty years and ten to twenty years—sentencing provisions that Congress never adopted.[10] The absurdity of this result

---

10. Moreover, the entire statute (as the Government has wanted to read it) may be unconstitutional. *Harris* was decided by a 5 to 4 vote. One member of the slim majority, Justice Breyer, stated in a concurring opinion that he could not distinguish *Harris* from *Apprendi*, but that he continued to believe that *Apprendi* was wrongly decided. *Harris*, 536 U.S. at 569–70, 122 S.Ct. 2406 (Breyer, J., concurring in part and concurring in the judgment). As *Apprendi* becomes more and more tightly woven into the fabric of American constitutional law, *see Blakely*, 542 U.S. 296, 124 S.Ct. 2531, and *Booker*, 125 S.Ct. 738, the continued viability of *Harris* and *McMillan* hangs by a thread. With the retirement of Justice O'Connor and the death of Chief Justice Rehnquist, two members of the *Harris* majority are no longer on the Court. The votes in *Apprendi* and *Harris* did not divide on neat ideological lines; both Justices Scalia and Thomas joined the *Apprendi* majority, and Justice Thomas dissented from *Harris*, believing that case indistinguishable from *Apprendi*. New Justices, appointed by a President who has expressed his admiration for

seems to have impelled the Circuit in *Gonzalez* to rethink its position by way of devising a contorted rationale for distinguishing the mandatory minimums in § 841 from those at issue in *Harris*. But this complex reasoning becomes unnecessary, once it is recognized that Congress never intended drug type and quantity in § 841 to be anything other than elements of separate offenses.

At the time *Campuzano* was decided, the Court of Appeals did not have the benefit of the constitutional analysis in *Apprendi*, and did not even discuss the possibility that there were constitutional problems with the interpretation the Court there adopted. Were the matter considered afresh today, the doctrine of constitutional doubt would afford a strong reason for taking a different view of the matter.

### C. *The Effect of Supreme Court Case Law*

As noted above, it was not until 17 years after the adoption of § 841 that an appellate court first suggested that it was unnecessary to prove the facts made relevant by § 841(b) to a jury beyond a reasonable doubt—and even then, that court spoke over dissent, in a case in which the issue had not been briefed. *United States v. Wood,* 834 F.2d 1382, 1388–90 (8th Cir. 1987). It is not difficult, however, to understand what led the *Wood* majority to its conclusion. The *Wood* Court relied heavily on *McMillan,* decided just the year before, which upheld against constitutional challenge the practice of judicial factfinding on a preponderance-of-the-evidence standard for factors triggering mandatory minimum sentences. *Wood,* 834 F.2d at

1389. Moreover, the Sentencing Guidelines (in the works since 1984), which rely on a similar factfinding scheme, were about to go into effect.[11] By 1991, a consensus had quickly formed in the courts of appeals, including our own, *see Campuzano,* that *Wood* had correctly decided that a jury need only find a generalized violation of § 841(a), and that the judge could then decide, by a preponderance of the evidence, exactly what sort of violation it was, and what penalty provision of § 841(b) applied.

The Supreme Court has never endorsed this consensus, however, and by 1999 the wind was blowing in a distinctly different direction. *Apprendi* and its progeny cast grave constitutional doubt on the blithe assumption that § 841(b) merely sets forth a set of sentencing factors. Moreover, *Apprendi* had been prefigured by *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), in which the Supreme Court reversed a Ninth Circuit decision that fit snugly into the *Wood-Campuzano* tradition. *Jones* interpreted the federal carjacking statute, 18 U.S.C. § 2119, which prohibits taking a motor vehicle from the person of another by force or violence. Like § 841, the statute is divided, albeit not into distinct subsections. The statute first defines the criminal conduct, and then provides three separate subsections setting forth distinct punishments: whoever violates the statute may be sentenced to up to 15 years, § 2119(1); if serious bodily injury results, however, a violator may be imprisoned for up to 25 years, § 2119(2); and if death results, the maximum punishment is in-

---

Justices Scalia and Thomas, may well take an equally stringent view of the jury trial right.

**11.** Notably, at least one circuit had ruled to the contrary before *McMillan, see United States v. Alvarez,* 735 F.2d 461, 467–68 (11th

Cir.1984) (interpreting drug quantity as an offense element), but that decision was swept aside in the post-*McMillan* enthusiasm for sentencing factors, *see United States v. Coy,* 19 F.3d 629, 636–37 (11th Cir.1994).

creased to life imprisonment, or death, § 2119(3). Despite the apparent division of the statute into violation-defining and penalty-describing portions, and despite the fact that the sentence-enhancing elements are contained in penalty provisions and not in separate code sections expressly defining distinct crimes, the Supreme Court recognized that the statute created three distinct degrees of crime, and that a defendant must be proved beyond a reasonable doubt, to the satisfaction of a jury, to have caused the sentence-enhancing harm, before the Court can impose the enhanced punishments for the higher degrees of carjacking.

A year later, in *Castillo v. United States*, 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000), the Court reversed another court of appeals ruling (this time by the Fifth Circuit) that had shown similar over-enthusiasm for finding a statute to create sentencing factors rather than distinct offenses. In *Castillo*, the Court confronted 18 U.S.C. § 924(c), which imposed a mandatory sentence of five years for using a firearm in connection with a crime of violence, but raised the sentence to thirty years if the firearm in question was a machine gun. As a pure matter of statutory interpretation, without reference to any constitutional principle,[12] the Court rejected the notion that Congress had intended that the nature of the firearm in question be a mere sentencing factor, to be decided by the sentencing judge by a preponderance of the evidence. But the Court simultaneously acknowledged that the statute's language "appear[ed] neutral" on the subject, 530 U.S. at 124, 120 S.Ct. 2090; that there were some "structural circumstances" supporting a contrary interpretation, *id.* at 125, 120 S.Ct. 2090; and that

(as is not the case with 21 U.S.C. § 841) there were indications in the legislative history suggesting that Congress thought its enactment related to sentencing, *Castillo*, 530 U.S. at 129–30, 120 S.Ct. 2090.

Dismissing these arguments in favor of finding that the statute created mere sentencing factors, the Court instead placed considerable weight on factors that are instructive in the context of narcotics offenses. First, the Court noted that the nature of the firearm has not been traditionally treated as a mere sentencing factor in statutes defining weapons offenses, but rather that numerous statutes treated the possession or use of different types of guns distinct offenses. *Id.* at 126–27, 120 S.Ct. 2090. Similarly, while the precise quantity of a narcotic drug is certainly a factor that is utilized by courts and sentencing commissions in imposing sentence within statutory limits, *see, e.g.,* USSG § 2D1.1 (classifying narcotics offenses into 17 different base offense levels based on quantity of various drugs distributed), it is also quite common for statutes to define different crimes (denoted as distribution of a controlled substance in various degrees) based on less-refined set of drug quantities. *See, e.g.,* N.Y. Penal Law §§ 220.31, 220.34, 220.39, 220.41, 220.43 (defining 5 different degrees of "criminal sale of a controlled substance" based on drug quantity and type, with the crime of criminal sale of a controlled substance in the fifth degree defined simply as "knowing[ ] and unlawful[ ] [sale of] a controlled substance").

Second, the Court noted that the difference between carrying a machine gun and a less destructive weapon "concerns the nature of the element lying closest to the heart of the crime at issue." *Castillo*, 530

---

12. *Apprendi* was sub judice when *Castillo* was decided, but the decision in *Apprendi* was not announced until three weeks after *Castillo*.

U.S. at 126–27, 120 S.Ct. 2090. The heart of the crime is using or carrying a firearm, and the power of the weapon dramatically affects the seriousness of the offense. "[T]he difference between the act of using or carrying a 'firearm' and the act of using or carrying a 'machinegun' is both substantive and substantial—a conclusion that supports a 'separate crime' interpretation." *Id.* at 127, 120 S.Ct. 2090. Here, too, the heart of the offense is distributing dangerous drugs, and there are dramatic differences between different controlled substances in terms of their danger. The penalty scheme reflects those differences: some drugs are "firearms," and others are "machineguns," and Congress has accordingly punished the crime of distributing heroin differently than that of distributing marijuana. This is a major qualitative difference between crimes, which cannot be papered over by the verbal similarity that both involve "distribution of controlled substances." While drug *quantity* may lie less close to the heart of the offense, because quantity is a matter of degree, it is also clear that, just as Congress has reflected in its penalty scheme, there is a dramatic difference between a small-time retail cocaine dealer, a wholesaler who distributes in quantities of a half-kilogram, and a major trafficker who distributes in quantities of multiple kilograms. *See* 21 U.S.C. § 841(b)(1)(A)-(C). While minor differences in quantity are (appropriately) treated by the Sentencing Guidelines as sentencing factors, at some point, this distinction of quantity becomes too large to be anything other than a difference of quality. As in *Castillo*, this conclusion "supports a 'separate crime' interpretation."

Third, the Court pointed out that "to ask a jury, rather than a judge, to decide whether a defendant used or carried a machinegun would rarely complicate a trial or risk unfairness." *Castillo*, 530 U.S. at 127, 120 S.Ct. 2090. Moreover, assigning this factor to a judge would risk "conflict between [the findings of] the judge and the jury." *Id.* at 128, 120 S.Ct. 2090. The same is true here. While it might be burdensome to ask a jury to pass on the many precise gradations of drug quantity that affect the recommended guideline sentencing range, it will rarely add much to the trial to ask a jury to determine the rather simple fact of what controlled substance was involved, and the slightly more difficult issue of what very rough order of magnitude of the drug quantity involved. Given *Apprendi*, a jury will have to decide the quantity in any event, for purposes of determining the upper limit of permissible punishment. It would be unseemly in the extreme for a jury to acquit a defendant of distributing 50, or even 5, grams of methamphetamine, thus limiting the maximum punishment to twenty years, and have the judge decide that nevertheless defendant *is* guilty (at least by a lower standard of proof) of distributing such a large quantity, and thus requiring a mandatory minimum of ten years in prison. The court and jury would thus have returned opposite "verdicts" on whether the defendant is guilty of the offense described in § 841(b)(1)(A).

Fourth, and most importantly, "the length and severity of an added mandatory sentence that turns on the presence or absence of a 'machinegun' ... weighs in favor of treating such offense-related words as referring to an element." Where the language leaves uncertainty about the congressional intent, "we would assume a preference for traditional jury determination of so important a factual matter." *Castillo*, 530 U.S. at 131, 120 S.Ct. 2090. This test too favors interpreting the different acts defined in the subsections of § 841(b) as separate crimes. While the refined distinctions in drug quantity in

USSG § 2D1.1 impose modest gradations of punishment as the precise quantity of each drug involved in the offense gradually rises, the distinctions in punishment level in § 841(b) are dramatic. There is a world of difference between punishment ranges of zero to twenty years in prison, five to forty years, and ten years to life. These are not the marks of mere "sentencing factors," like those in the guidelines. Juries have not traditionally passed on every fact that a judge considers in imposing sentence, but given the importance of the matter in determining the vastly different punishment ranges to which a defendant will be exposed, we should "assume a preference for traditional jury determination of so important a factual matter." Here, as in *Castillo*, the "length and severity" of the added punishment "weighs in favor of treating [the drug nature and quantity distinctions in § 841(b) ] as referring to an element."

The result in *Campuzano* may be understandable in light of the state of the law when it was decided, but it is very doubtful whether the Supreme Court would interpret § 841 the same way, after *Apprendi, Blakely, Jones* and *Castillo*, or whether the Second Circuit would reach the same conclusion if it faced the issue afresh today, with the benefit of the Supreme Court's recent constitutional and statutory jurisprudence regarding sentencing regimes.

### D. *Current Circuit Caselaw*

■ For the foregoing reasons, this Court believes that the correct interpretation of § 841, and the one most likely to be adopted by the Supreme Court if the issue were to be decided by that Court, is that both the nature and quantity of the controlled substance are elements of separate offenses defined in the subsections of § 841(b), and that as a consequence, (1) at a trial the Government would bear the burden of proving the nature of the drug and the threshold amounts of drugs, and (2) a valid plea of guilty cannot be entered to a generalized offense of "distributing a controlled substance in some amount in violation of § 841(a)."

As regards drug quantity, the Second Circuit has now reached the same conclusion, albeit by a different, constitutional route, in *Gonzalez*. The prior Circuit caselaw set forth in cases like *Campuzano* and *Luciano* has apparently been discarded. *See Gonzalez*, 420 F.3d at 132–34 n. 18. The Circuit does not appear ever to have ruled that drug type is a mere sentencing factor, though as noted above, in view of the language and structure of § 841, it is difficult to devise a rationale for treating drug type differently from drug quantity. To the extent a distinction can be made, the argument for treating drug type—a more fundamental matter— as an offense element is even stronger than the argument for so treating drug quantity. Indeed, as the Government has argued in this case, the Second Circuit, without expressly addressing the issue, or attempting to reconcile the statements with its position on drug quantity, has implied that drug type *is* an offense element. In *United States v. Outen*, 286 F.3d 622, 636–37 (2d Cir.2002), for example, the Court stated that where a defendant has been found guilty of distributing an indeterminate amount of a particular drug, for purposes of determining the maximum constitutionally-permissible sentence under *Apprendi*, "21 U.S.C. § 841(b)(1)(C) provides the 'default provision' ... for most controlled substances," while in cases involving marijuana, the lower penalty applied by § 841(b)(1)(D) provides the default. This suggests that the distinction between marijuana and other controlled

substances, at least, is not simply a "sentencing factor."[13]

A further reason supports treating the type of drug distributed as an element of a separate offense. A defendant who admits to distributing cocaine or methamphetamine has clearly acknowledged *facts* that make him guilty of a crime, even if the precise degree of punishment for that crime requires further factfinding as to quantity. A defendant who states, as did Arias, that he "conspire[d] with other persons to distribute a controlled substance in violation of the narcotic laws of the United States" (4/19/05 Tr. 48) has not admitted to any *fact* indicating his guilt, but has rather stated a legal conclusion. Without a statement as to what the substance was, the Court cannot determine that the defendant in fact violated the law at all; perhaps he distributed some substance that he believed was illegal, but whose distribution is not actually illegal. The situation at trial is similar: when an indictment charges a defendant with distributing methamphetamine, the jury must decide as a question of fact whether methamphetamine was the substance involved, but the jury is told that as a matter of law methamphetamine is a controlled substance. The jury is not told that the defendant is charged with distributing a "controlled substance," and then given a list of all the substances that are covered by that definition. As a practical and procedural matter, it makes sense to treat the distribution of different illegal drugs as separate crimes, and thus to require the indictment to specify, the jury to find, and a defendant to admit in a guilty plea what drug he distributed.

**13.** *Outen* cannot be regarded as controlling, however, because the defendant there was convicted of counts specifically charging distribution of marijuana, and acquitted of separately-charged counts involving cocaine. While the Court specifically upheld the validity of convictions under indictments that left open the *quantity* of the drug distributed, 286 F.3d at 635–36, it had no occasion to address whether the defendant could have been convicted under a charge that left open not only the quantity but also the *nature* of the drug involved. The Court's exact language demonstrates the confusion so often involved in these discussions. Citing *United States v. Thomas*, the Court stated that "drug quantity becomes an 'element of the offense' under § 841 only where 'the type and quantity of drugs involved ... may be used to impose a sentence above the statutory maximum for an indeterminate quantity of drugs.' 274 F.3d at 660 & n. 3. Thus, an indictment today which charged a violation of § 841(a) and included no allegation of drug quantity would state a crime and be a perfectly valid indictment. Moreover, contrary to defendant's suggestion, there is a prescribed penalty for such a crime: the provisions of § 841(b) which prescribe a penalty for an indeterminate quantity of drugs, i.e., for most controlled substances, § 841(b)(1)(C)." *Outen*, 286 F.3d at 635–36. First, the Court cannot really mean that drug quantity literally "becomes an 'element of the offense.'" If that were so, an indictment could not leave quantity out. What the Court means is that drug quantity must be *treated as* an element in the sense that the failure of a jury to find the requisite threshold quantity beyond a reasonable doubt precludes a punishment in excess of the default statutory maximum, under the *Apprendi* principle. Indeed, the recently issued *United States v. Cordoba–Murgas*, 422 F.3d 65 (2d Cir.2005) makes this clear. The Second Circuit in *Cordoba–Murgas* clearly held that "if a defendant is indicted for a violation of 21 U.S.C. § 841(a), but the indictment does not specify the quantity of drugs, the District Court cannot impose a sentence above the statutory maximum for an indeterminate quantity of drugs, even if the defendant later allocutes to a particular quantity." Second, the Court stated that drug *quantity* must be treated thus where the *type and quantity* of drug involved increases the statutory penalty, without considering the effect of this reasoning on the (presumably unusual) situation before the Court here, where the *type* as well as *quantity* of the drug is left open. Nevertheless, *Outen* at least implies that the distribution of cocaine and the distribution of marijuana as separate offenses, for which separate default punishments are provided.

That is of course what Congress intended and expected in enacting, and amending over the years, § 841. This Court hopes that the appellate courts will restore coherence to the law by recognizing that this conclusion entails the further conclusion that the threshold quantities, and other factors defined in the subsections of § 841(b), are also elements of separate crimes. Drug type and quantity should not merely be "treated as" offense elements. They *are*, and always have been, such elements. In *United States v. Vazquez*, 271 F.3d 93, 107 (3d Cir.2001), then-Chief Judge Becker, urging many of the same points made above, argued that it was time to re-examine the circuit courts' interpretation of § 841. Quoting Justice Frankfurter, he pointed out that "[w]isdom too often never comes, and so one ought not to reject it merely because it comes too late." *Id.* (quoting *Henslee v. Union Planters Nat'l Bank & Trust Co.*, 335 U.S. 595, 600, 69 S.Ct. 290, 93 L.Ed. 259 (1949)) (Frankfurter, J., dissenting) (internal quotation marks omitted). Reexamination of these precedents is not, in fact, too late; it is merely overdue.

■ At any rate, regardless of the best reasoning or characterization of the holding, it seems clear that *Gonzalez*, rather than *Campuzano*, is the controlling authority for the practical question of whether drug type and quantity must be treated as offense elements. Following *Gonzalez*, this Court concludes that since Arias was charged with distributing 50 grams or more of methamphetamine, and failed to acknowledge at his plea that he distributed that amount, or even that particular controlled substance, he has not validly pled guilty to the offense charged.

### III. *Application to this Case*

Arias was charged with conspiring to distribute a specific quantity, 50 grams or more, of a specific substance, methamphetamine. Indictment, ¶ 2. In purporting to plead guilty, however, he did not acknowledge that he was guilty of this crime. Rather, he simply stated that he "conspire[d] with other persons to distribute a controlled substance." Since that admission (as expressly elaborated by his attorney) was deliberately intended to leave open the possibility that the substance was something other than methamphetamine (specifically, marijuana) in order to avoid subjecting him to a statutory presumption against bail pending sentence, Arias did not in fact admit that he was guilty of the crime charged. His plea is thus insufficient, as it does not admit to every element of the offense, and it may not be accepted by the Court.

■ That the Court mistakenly accepted the plea when it was proffered is unfortunate, but does not affect the foregoing analysis. "Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Fed. R.Crim.P. 11(b)(3). "If [a court] decides there was no factual basis for a guilty plea after accepting it, the court should vacate the plea and enter a plea of not guilty on behalf of the defendant." *United States v. Smith*, 160 F.3d 117, 121 (2d Cir.1998). *See also United States v. Ventura–Cruel*, 356 F.3d 55, 58–61 (1st Cir.2003) (upholding district court's rejection of previously accepted plea).

At the time of the plea, Arias did not admit that he had distributed methamphetamine, and the Government did not proffer evidence demonstrating that he had done so.[14] Accordingly, the present

---

**14.** The factual basis for a guilty plea need not come from a specific admission by the defen-

dant. *See United States v. Maher*, 108 F.3d 1513, 1524–25 (2d Cir.1997). In some cases,

record contains no basis for the Court to determine that there is a factual basis for a plea of guilty to the offense charged, which is distribution not of some generic controlled substance, but specifically of 50 grams or more of methamphetamine. The Court must therefore withdraw its acceptance of the guilty plea, re-enter a plea of not guilty on defendant's behalf, and continue with further proceedings to determine whether defendant is guilty or not of the crime charged.

## CONCLUSION

For the reasons stated above, the Court grants the Government's application to withdraw its acceptance of defendant's proffered plea of guilty. The parties will appear for a conference on September 30, 2005, at 2:45 p.m. to schedule further proceedings in the case.

SO ORDERED.

the defendant may not in fact know exactly what drug was in a package he distributed, but knew that it was an illegal drug. Such knowledge is sufficient for conviction. *See United States v. Carranza,* 289 F.3d 634, 637–39, 643–44 (9th Cir.2002). In such a case, if the Government can demonstrate (as, by testing the substance after a seizure) exactly what the drug was, the defendant may validly plead guilty by admitting that he knew the package contained an illegal drug, and that he has no basis for contesting the Government's proof as to what the drug was. But that is not the case here. Arias does not contend that he was unaware of the type of drug he distributed, and he has not acknowledged the accuracy of any Government proof as to what that drug was. Rather, he has simply declined to admit what he did in an effort to keep the issue open in an effort to secure advantage in regard to bail determination, sentence, or both.